Good morning all. Our first case for argument this morning is Kawasaki v. Plano Molding. Mr. Mead. Good morning. May it please the Court, I'm appearing for the appellants. And at the beginning, I have five major points that I hope the Court will take away this morning, that I'd like to go through quickly, I hope within five minutes. And I particularly am arguing this for the Union Pacific because the Union Pacific, the way the district court decided the case, is effectively deprived of the warranty, which I'm about to talk about. Under Clause 2 of the World Bill of Lading, I know this Court is familiar with this case already, so I will skip a lot of background. Clause 2 of the World Bill of Lading, Plano is a merchant and it's bound to the World Bill of Lading under Clause 10.2. World, of course, was the prime contractor with Plano to carry the Plano cargo by ocean and rail. Plano cargo weighed 18,900 pounds, the larger of the two crates. Clause 10.2 requires that merchants warrant suitable stowage for the carriage contemplated. And it provides for indemnity for any loss or damages caused by a breach of that warranty. Clause 3, of course, applies Clause 10.2 to the subcontractors including K-Line and Union Pacific. So let me just, since we've heard this case before, we're pretty familiar with a lot of this background information you're providing. I want to get to the pallets, and you don't dispute that there was a second pallet, do you? No one ever found it, but I don't dispute the likelihood that there was a second pallet. Then my issue is I don't understand why it wasn't reasonable for the district court to have doubts about Dr. Vecchio's definitive statement that weight dispersal was improper when he could not account for any weight dispersal by the second pallet. Well, there were many reasons for that. Weight dispersal by the second pallet is by no means shown by the evidence to have been dispersing the weight of just the larger crate. And moreover, two pallets together, if they were both under the larger crate, would not have, under the Vecchio testimony, necessarily have been adequate to disperse the weight because Vecchio explained what was required to disperse the weight uniformly and in a Christmas tree fashion, that's the way he described it. The district court looked at Exhibit 281, which is the lower of two pictures which the court will see when it looks at its disk. And the district court relied on looking at the picture of the two pallets in Exhibit 281. These are two pristine pallets. They're undamaged. There's not a mark on them. And just with the naked eye, you can see that one of the pallets, the boards are approximately six inches wide, not three inches wide. If you then look at the pallet that was found in the container, which is Figure 1.7 of Exhibit 142, the Vecchio report, you will see that the one pallet found in the container was all smashed up. Yeah, but I thought the court looked at that picture, the one you showed to us, showing the two pallets. The point of that was to show the size of the pallet and show how that pallet could accommodate the weight of the crates. I mean, it wasn't to try to show the actual one. That's the picture like you're showing us now. The way it was written in the decision, the court said that those two pallets were at the site of the wreckage, that they were actually pallets which were in the wreck itself. Nothing the court said indicated he was talking only about the size or the nature of pallets. He referred to the materials in the figure in Exhibit 281 as actually being the planks, the eight-foot, apparently eight-foot planks, and the pallets as actually being materials which were in the container. In no way did the court simply refer to Exhibit 281 as merely examples of pallets. There was no function. There was no point to him looking at Exhibit 281 to show what pallets were or what they looked like. And, in fact, the pallets, the outer pallet in Exhibit 281 does not match the broken pallet in Figure 1.7. Well, do you agree that a second pallet could have made the weight dispersal proper? I do not, because Dr. Vecchio testified very specifically about what was required. Minimum eight-foot, you can call it dunningers. But Vecchio did not rule out this possibility, right? He did rule out the possibility. Well, possibility, he ruled out any sort of positive proof of any kind that pallets, by themselves, could have been satisfactory because the dunnage or skids, if you want to call it that, which is required by the test, by all the evidence in the record, is eight feet long, which means that it carries the weight throughout its whole eight-foot length, spreads it uniformly in a crystal strip. Was Dr. Vecchio aware of the wood bracketing that was used? Well, the wood bracketing is not totally speculative because if you look at it... Maybe you didn't hear my question. Was Dr. Vecchio aware of the wood bracketing? No, I heard the question, Your Honor, but I'm getting to it. I see. The wood bracketing was not in evidence clearly. There was a piece of wood in Figure 1.7. The wood bracketing was referred to in the e-mail from Joanna Fang to World. Was Dr. Vecchio aware of that e-mail? Well, yes, he was. He did not... And then he prepared his report. He did not discount the possibility of bracketing or the likelihood of bracketing to keep the cargo from sliding. But bracketing... Wouldn't the bracketing serve some purpose in dispersing weight? It would not in any way, shape, or form. None whatsoever. There's nothing in this record. Bracketing is strictly, as Joanna Fang said in her e-mail, she said that the crate was fixed, was bracketed fixed, so it would not move. That's all bracketing is for. There was also a mention of softwood bearers, which are little chocks on the floor of the container. No, bracketing... And bracketing is shown in the American Railroad Association figure in the Circular 43D. There is a picture of what bracketing looks like, and it has nothing to do with spreading the weight on the lower part or spreading the weight from the downward force of the cargo. None. It just keeps it from moving, hopefully, sideways or perhaps forward and back. That's all bracketing is for. It's not between the cargo and the floor. And the ED&T report, which was referenced by Plano's witness Kaplan, said that as far as the one pallet which was found in the crate, ED&T found that it was in direct contact, that's the words they used, with the plywood floor of the container. Now you might say, well, how can they tell that? Well, they can tell it by whether there are nail holes in it. They could tell it perhaps a number of other ways. But their report, which was referenced by witness Kaplan, said that this cargo on pallets was in direct contact with the container floor. However, they determined that by examining the wreckage. So I have to say categorically, no, the bracketing serves no function. Vecchio was very clear there had to be eight-foot pieces of wood of a proper material, not something flimsy, and that's what is specified in the rail circular 43D also. 43D says you've got to, they say, ten feet. It's got to be nailable. It can't have imperfections in it that prevent it from being nailed to the floor. That's the requirement of the warranty, which is applicable to Plano. In Vectech report said the crates were lashed, and the THI email said the wooden brackets were used to fix the cases so they wouldn't move. Correct. And the court challenged or questioned Vecchio's analysis based on his statement that there was no evidence of lashing. And the court found that Vecchio relied heavily on that report for all of his analysis, but he ignored the portion that said the crates were lashed and, you know, basically said he picked and, you know, he just picked and chose what he wanted to rely on, what he wanted to ignore. The court was wrong. Vecchio stated very clearly the basis of his analysis. It's true. In the course of looking at the debris in the container, he mentioned everything he saw or didn't see. And one of the things he said was he didn't see any lashing. Nobody else saw any lashing either. There's not one witness who said they saw any lashing. That's fine. But Vecchio nowhere relied upon the absence of lashing in relation to the crate going through the floor of the container. Nowhere. Yes, he talked about it. But, no, he did not rely on lashing. That was a flat misstatement by the court, and the court spent a lot of time on it. My friend spent a lot of time on it on brief. But the explanation that Vecchio gave was that the floor was overloaded, and because it did not have sufficient supports, and the cargo tore the 55-inch hole in the floor and fell through the road bed. He never, ever said anything about lashing having anything to do with the overload. He said that there was a static overload. I'm static right now, standing still here. Right in the container at the rail yard. He does talk quite a bit about vertical dynamic loading, doesn't he? Well, there's a good bit of confusion. There is vertical dynamic loading throughout the rail journey or a truck journey, even the ocean journey. There's dynamic loading. That's what I was going to say. I'm static here. The static load, Vecchio said, was twice the allowable limit, just sitting in the rail yard. When I start moving around, I'm no longer static. I'm dynamic. So as soon as the train started to move, there was dynamic loading from the motion of the train. There had to be. The train goes up and down. The train sways from side to side. That's dynamic loading. There was confusion between the ratio of the increase in loading, which is dynamic acceleration, and dynamic loading. But he said that twice the allowable limit, Vecchio said, was an overload by a factor of two, even without any dynamic events. But there were dynamic events, of course. A train going 70 miles an hour over the way roadbed and tracks are is going to bounce around some. That's going to put extra stress on what is an overload in a static position. That's the dynamic loading that Vecchio was talking about. We said that in the brief, that there were dynamic events. It could have gone over rough switches. It could have been any number of things. All we do know is, and this is the beginning of our carrying our prima facie case, is the crate went through the cross beams. It broke through the cross beams. This is not an event that happens every day. And what I was saying about the Union Pacific is that what the district court did was it effectively neutered the warranty. The district court agreed with Kaplan. Kaplan's agreed there was dynamic overload. His numbers were a little different. He said it was 3,792 pounds per linear foot and the maximum allowable is 2,500. We put that little mathematic thing aside. He agreed without anything but a pallet, with only a pallet, there was that overload. And then he said, but it doesn't make any difference. And here is a key to the whole major key to the court's decision. Kaplan said it doesn't make any difference. K-Line has to give us a container which will stand up to whatever overload we put on it. He said it again in his testimony. And the court bought into it. What that means is that Union Pacific is left with nothing. K-Line is left with a problem. But Union Pacific or a truck driver is left with nothing because if K-Line doesn't give the shipper a container that can withstand 5,000 pounds per according to Kaplan and according to the district court, then K-Line is responsible, not the people who put the excessive load in the container. What does that mean to poor Union Pacific? That means they've got nothing. They have to rely on K-Line to give a container to the cargo interest that will withstand anything that the cargo interest put in the container. What does that mean to the truck driver? It means he gets a sealed container. He's stuck with any amount of overload that the cargo interest put in there. And if K-Line has not foreseen the unlimited possibility of overload and that cargo breaks through the floor of the container while he's driving down one of these Chicago streets, you could have a crash like we had here some when a light bar fell off of a truck with an ocean container. So by saying that K-Line must guarantee that any overload must be supported by its container, that eliminates the warranty. That leaves all the cargo interest scot-free to put on any load they want. And I submit that is totally unreasonable. What it does, it's a backdoor way of coming around and saying, well, there's a warranty and maybe Plano's bound by it, but actually if Plano breaches it, it's K-Line's fault if the cargo goes through the floor because K-Line didn't put in cross beams that would withstand 20,000 pounds of load per linear foot. So what it is, it's a backdoor way of saying the warranty is meaningless. Mr. Mead, do you want to reserve some time? You have reserved four minutes. Am I over already? Oh, there's the light. I'd better take my four minutes. Thank you very much. Thank you, Mr. Mead. Mr. Wasserman. Good morning. Alan Wasserman for the Apelli Plano Molding Company. This is not a complicated case. You wouldn't know that from the briefing. Well, what's truly troubling is this is a derailment that occurred in April 2005. It's nearly ten years later, and we're still here litigating this case. The district court, sometimes you try a case, then you read the decision, and even when you win, you look at the decision and you see problems with it, and you wonder, am I vulnerable on appeal? The judge could have done a better job in his decision. This was not one of those situations. I read Judge Leinweber's decision. I thought his analysis was detailed, thorough, logical. He walked through all of the evidence. Now, I could certainly see where Kline, where the appellant, might not agree with the conclusions he reached, and it's possible somebody else reading his decision might not agree with the conclusions he reached, but we're not here to retry the case. We're here to look at whether or not he met the standards that he was obligated to follow, and whether his decision reveals how he reached that decision. Now, a number of things I would like to address, and I'll try to be brief. The judge didn't look at Exhibit 281 and say, ha-ha, those are the two pallets that were in the container. That's the dunnage, the long strips of wood that supported the crate. That's not what he did. The reason that I introduced Exhibit 281 was because the appellant's expert, Dr. Vecchio, had testified that he searched the crash site and could find nothing, no evidence of anything that would properly disperse the weight of the heavier crate. That was his statement, and ultimately every calculation, every analysis that he did was based on the assumption that there was nothing dispersing the weight of the larger crate. And, in fact, that's what they say is the essence of the case. And I want to get this right. They say too much weight on too small a footprint of the larger crate was the essence of the case. Every calculation Dr. Vecchio did was based on the assumption, on the supposition, on the speculation that the crate was not properly supported. And he said, I looked and I found nothing. The reason I introduced that photograph was not to say, here it is, these are the pallets and this is the dunnage that the crate sat on. It was to show that Dr. Vecchio's statement could not be true, that essentially there was a lumberyard of material that was there that could have supported the crate, and Exhibit 281 was an example of that. Now Dr. Vecchio was very candid and forthcoming in his testimony about what was necessary to properly support the larger crate. He said a pallet of proper size would be appropriate, although he did say it would have to be a very, very large pallet. With respect to dunnage, and it's a fancy word that we don't use every day, dunnage could merely be long strips of wood, planks, or squared lumber. And Dr. Vecchio acknowledged that. He said if the heavier crate sat on an appropriately sized dunnage or pallets, then you would not have had too much weight concentrated in too small an area. And what the judge found, and what we tried to prove, and what I think even Dr. Vecchio acknowledged, is that yes, if the planks in Exhibit 281 in that photograph were of the proper size and proper, if they didn't have defects in them, that would have supported the larger crate. 281 was just an example. You heard there was testimony in the transcript that there was debris everywhere. So it is wrong to say that the judge looked at 281 and said, ha-ha, that's the dunnage, those are the pallets. Now with regard to securing and lashing, securing and lashing is not an invention of the judge, nor was it a fabrication of the appellees, to make a point. Securing and lashing was critical to Dr. Vecchio's argument, and I'll try to explain this as simply as possible. If you look at Dr. Vecchio's analysis, which is flawed because it assumes a critical fact, and again, I want to emphasize this. It assumes the larger crate was not properly supported, with no evidence. He just makes that assumption. Every conclusion he reaches is therefore subject to challenge, which is what the judge found. But let's assume that you have a crate, and it's too heavy, and it's not supported by proper dunnage. Dr. Vecchio's analysis showed that in a static condition, the container would not necessarily fail. He needed more. That's why he introduced the concept of dynamic amplification, of vertical acceleration into his analysis. He needed that to get the container to fail. Now, how does the lashing come into play? I'm going to demonstrate this as simply as I can. I tried to figure out different ways to do this. I think this works. If you have a crate sitting on the floor of a container, and you have the container going up and down, if the crate is lashed securely to the container, it moves up and down with the container. Now, if there's no lashing, you have this. Now, in Dr. Vecchio's report, he makes a big deal about the dings that he found in the plywood floor. In fact, they were so important, he took molds of the dings, which seemed a bit surprising, but that's an important part of his report, and that was an important part of his testimony, because what that shows is, according to Dr. Vecchio, the dings show that the crate was not properly secured and lashed. So as the train is moving along, in fact, throughout the transport, from China across the ocean and on the train, because those crates were not secured and lashed, it's bouncing up and down in the container. That's dynamic amplification. That's the extra bit he needed to get that container to fail under his analysis. Now, Mr. Wasserman, from the trial judge's perspective, all of the ifs and the assumptions make this, of course, a very difficult factual determination for him to make. What really would have helped would have to have had some information about the packing, the actual packing, and that was not produced. There are people who actually packed this crate and saw inside and could have produced that, and I guess Kayline and UD Pacific are saying that information was more available to your side of the case. They say that, but they did not demonstrate that. And, in fact, what evidence? There was no evidence of what the usual packing techniques are at the Shanghai shipyard or that Kunshan would use when it was having these things shipped. They made other molds and so forth. There was no information about the usual practice. If I were the trial judge, that would have been the principal question, and, in fact, I believe in his decision. He ponders, this would have been useful information for me to have. My client did not bear the burden of proof. In every trial, attorneys make a choice as to how they will present their case, what experts they choose. Dr. Vecchio is an eminently qualified expert on many different subjects he's testified in major cases. He had absolutely no experience with respect to the proper stowage of crates within an intermodal container. Now, he did have experience with the failure of intermodal containers and railroad-related accidents. I think there was an Acela accident that he was an expert on. But the critical issue that the judge needed information on, because this is the warranty. The warranty was that the goods would be properly stowed for transport. What constitutes proper stowage? That's the question that the appellants bore the burden of producing evidence on. Dr. Vecchio couldn't. If you go to the transcript where I ask Dr. Vecchio about his expertise with respect to the securing and lashing or stowing of goods in an intermodal container, it's very telling. His answer is very evasive. He knows that he has a problem, because that's really not what he was retained for. That's not what he was an expert on. Now, notwithstanding that deficiency in his background and experience relative to what the case required and the appellants' burden of proof, there was evidence that his counsel or Dr. Vecchio could have turned to, and that is the Intertech Calibret report. In that report, it talked about the lashing and securing of the crates. Dr. Vecchio was fully familiar with that report. As the judge pointed out, he relied on it for numerous types of information. Now, it doesn't mean that information was correct, but it was information that Dr. Vecchio was comfortable enough in relying on. That report was the roadmap to Dr. Vecchio or to appellants' counsel to decide, okay, we need to prove there was a breach of the warranty. We need to prove that the crates were not properly secured or stowed within the crate. These are the people who did it. These are the people who know. Let's reach out to them. Let's talk to them. Let's see... They interviewed the relevant people. Let's go to those people. That didn't happen. They chose the wrong expert. And counsel... And hindsight is wonderful, so I'm not being critical. But they did not give the district court judge the information that the district court judge felt he needed for them to meet their burden of proof. I did not bear that burden. My client did not bear that burden. Earlier, Your Honor pointed out that there was that email from THI from Ms. Fang. Dr. Vecchio wasn't even aware of it. It wasn't brought to his attention. There was also a test of... Union Pacific effectively argues that the burden shifted to you because the information was more available to Plano. I would challenge counsel to show where in the record they have established that. Moreover, I think there's a suggestion in the reply brief that we could have obtained the information from John Wember of World. One, John Wember testified at trial on Kaline's behalf. Two, World settled with Kaline at a fairly de minimis amount and in return agreed that they would testify. They agreed they would testify truthfully, but they testified on behalf of Kaline. I believe the record also shows that, and I hope I'm not confusing what exhibits that might not have gone into evidence, but it also shows that Mr. Wember works for a company where they have a contractual arrangement with Kaline. We did not have better access to the information. I hope the court never loses sight of the fact that however you spin this and however complex and arcane and bizarre maritime bills of lading are with respect to the definition of merchant and where the burden of proof lies and who warrants what, Plano is a company in Illinois that ordered some molds to help it manufacture plastic injection molded cases for crossbows and caboodles and cosmetic kits. That's what they do. They ordered goods to be manufactured in China. Plano did not pack the goods. Plano was not there when the goods were packed. Plano simply ordered goods. Now counsel, if he chooses to use his time this way, will argue it's a little more complicated than that and Plano was a bit more involved. But there's no evidence showing that Plano could merely have picked up the phone, called their buddies in China and said, guys, I need all of the evidence as to how the goods were stowed because I'm going to need that at trial. There's nothing in the record to support that. In fact, to the contrary, everything in the record, particularly the fact that Mr. Wember testified on behalf of Kaline demonstrates that that evidence was more readily available to Kaline. But again, I go back to burden of proof. They had the burden of proof and they agreed that they had the burden of proof. Let me ask you more about this weight dispersal. Was the court's finding that the second pallet could have dispersed the weight based on fact or was that speculation based on evidence that a second pallet existed? The fact it is based on was, I believe, the testimony of Dr. Vecchio and possibly other experts that a properly sized, I believe I asked the question, would a properly sized pallet be able to disperse the weight of the larger crate? Dr. Vecchio's response was yes, a very large pallet could do that. So the court was not speculating as to whether the weight of the larger crate could be properly dispersed. The judge was relying on the evidence that was produced at trial. In fact, if you go to Circular 43D, which plaintiffs, excuse me, which appellants introduced into evidence as the standard for how you're required to disperse weight, they attached to their expert report a drawing, a figure, I think it's 3.2.1, and it shows a truck with a container in the truck. Now you might wonder why the Railroad Association shows a truck with a container. In the beginning of that circular they say whether the pictures of a truck or a train, it applies equally. That diagram shows how you can correctly disperse the weight of a crate that would otherwise be too large. That is not a figure, and I would urge the court to go back to that figure. It's showing how you properly disperse the weight and the way you properly disperse the weight is with an appropriately sized pallet. So the speculation in this case, the only speculation in this case, is Dr. Vecchio's speculation that the crate had to have sat on an inadequately sized pallet or dummage. Every calculation he makes is based on that speculation. Unless the court has any further questions I would rest on our papers. Thank you, Mr. Wasserman. Thank you. Mr. Meehan. I accept my friend's challenge. Remember that this, as my friend said, this took place ten years ago. Mr. Wember testified last year. The email exchange in Exhibit 280 between Wember and Joanna Feng shows that Joanna Feng was terrified that THI was somehow going to be held liable. And she told Wember, we don't have any pictures, but this was loaded by regular request, meaning normal weight, fixed with brackets. Had there been any dunnage, skids, underneath that larger carton, human nature being what it is, Joanna Feng would have screamed, but we had eight-foot dunnage, we had ten-foot dunnage, we had everything. But the main point I'm saying is, under Irving's paper, Plano had access back then, right after. They had Wember to talk to Joanna Feng in just one email. Joanna, was there dunnage? You may have another two minutes, Mr. Meehan. Thank you very much. I think they had perfect access through Wember or through THI, through CMT. All they had to do was go to Joanna Feng and say, what was underneath that larger crate? They didn't do it. We can't speculate why they didn't do it, but they didn't do it. We couldn't do it. We sued THI four times in the Southern District of New York under this multi-district litigation, trying to find out. We served letters of rogatory to try and get the story on the loading. They were refused. We did everything we could do. Plano did not. Mr. Meehan, if I could just take a second or two to talk to you so I can clear up this lashing issue. Yes. I want to make sure I understand your position on appeal as well as below. You strongly, it seems to me, urge that an argument was never made to the district court that the moles were not secured. Not by us. Right. It's argued only that the weight was not sufficiently dispersed, right? Correct. I can quote it. But doesn't Dr. Vecchio, when speaking about the gouges, as you had referred to in the floor, say they could only have been caused by the bouncing of the crates because the crates were not lashed vertically? That's true, but he didn't rely on those dings. He didn't rely on anything about dynamic acceleration. He just said the dynamic events. He said first that the static overload standing still was exceeded, broke the warranty. And his cause was this. It is clear that the root failure of container and the subsequent derailment was that the container was overloaded well in excess of both the allowable load level and the container floor's ultimate strength, separate appendix 53. That was his reason. He said nothing about lashing. And my friend is assuming that lashing will prevent the carton from moving, experiencing any dynamic loading. There's no proof of that in the record. And as an old railroad man, I don't think it's true. Dynamic lashing will keep it from falling over. It may have some effect, but everything in that railroad car is going to be going like this at 70 miles an hour. It will not, lashing would not affect the sweep of the bounce? Oh, I think it probably would. If there had been lashing, no one found any. And there were hooks. You can see them in the pictures. They don't have a mark on them. Lashing, according to the exhibit, Circular 43D, is supposed to be of steel. Oh, it'll have some effect, no doubt. But mostly it's going to keep it from falling over. But when you're inside a railroad car at 70 miles an hour, or on top of it, even at 40, as I have been, you know what happens to a railroad car. And that cargo was subject to dynamic loading, regardless of whether it had lashing. That's why Vecchio said it doesn't make, he didn't include it in his finding. I think I've overstayed my welcome here. Any more questions? This is not a circuit where we tell counsel they overstay their welcome. Thank you very much. If you need to make a concluding remark, Mr. Mead, you may do that. Well, only that Dober was violated. There was no analysis of relevance. There was no analysis of reliability, period. It was all just conclusion that he found that the Kaplan was more credible than Vecchio. That's not Dober, in any way, shape, or form. So right away, that has to be thrown out. And that really is all I have to say. Thank you very much. Thank you, Mr. Wasserman. Case is taken under advisement.